Bradley K. OELTJENBRUN, Plaintiff,

v.

CSA INVESTORS, INC., and Iowa corporation; Land O' Lakes, Inc., a Minnesota cooperative; Farmers Cooperative Company, an Iowa cooperative; and Farmers Cooperative Society, an Iowa cooperative, Defendants,

and

LAND O' LAKES, INC., a Minnesota cooperative, Counterclaim Plaintiff,

v.

Bradley K. OELTJENBRUN, Counterclaim Defendant,

and

FARMERS COOPERATIVE COMPANY, Counterclaim Plaintiff,

v.

Bradley K. OELTJENBRUN, Counterclaim Defendant,

and

FARMERS COOPERATIVE SOCIETY, Counterclaim Plaintiff,

v.

Bradley K. OELTJENBRUN, Counterclaim Defendant.

No. C 96–3136–MWB.

United States District Court,
N.D. Iowa,
Central Division.

April 19, 1998.

Steven P. Wandro of Wandro & Gibson, P.C., Des Miones, IA, for Plaintiff.

Jonathan C. Miesen of Doherty, Rumble & Butler, St. Paul, MN, for Defendant Land O' Lakes.

Brenton D. Soderstrum of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, PLC, Des Moines, IA for Defendant FSC.

Joel J. Yunek of Laird, Heiny, McManigal, Winga, Duffy & Stambaugh, PLC, mason City, IA, for Defendant FCC.

## MEMORANDUM OPINION AND ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT

BENNETT, District Judge.

### TABLE OF CONTENTS

I. BACKGROUND .................................................. 1028
 A. Factual Background ...................................... 1028
 B. Procedural Background ................................... 1030
II. LEGAL ANALYSIS .............................................. 1031
 A. Standards For Summary Judgment ......................... 1031
 B. The Declaratory Judgment Claim ......................... 1033
 1. The Declaratory Judgment Act ....................... 1033
 2. "Futures" and "cash forward" contracts under the CEA ... 1033
 a. "Futures" contracts ........................... 1033
 b. "Cash forward" contracts ...................... 1035
 3. Which kind of contracts? ........................... 1037
 a. The Land O' Lakes contract ..................... 1038
 b. The FCS contracts ............................. 1041
 c. The FCC contracts ............................. 1045
 C. Remaining Claims Against Land O' Lakes ................. 1048
 1. "Mere continuation" ................................ 1048
 2. Defenses against a successor ....................... 1050
 3. Breach of contract ................................. 1050
 D. Remaining Claims Against FCC ........................... 1051
 1. Misrepresentations and apparent authority of the speaker ... 1051
 2. Breach of contract ................................. 1052
 3. Breach of fiduciary duty ........................... 1052
III. CONCLUSION ................................................. 1053

Now before the court is one of the fundamental—and highly contentious—questions asked in a multiplicity of lawsuits between grain producers and grain elevators filed in the last two years: Are certain so-called "hedge-to-arrive" (HTA) contracts for the sale and purchase of grain illegal off-exchange "futures" contracts under the Commodities Exchange Act (CEA), 7 U.S.C. §§ 1–25, or valid "cash forward" contracts not within the regulatory purview of the CEA? [1] In separate motions for partial sum-

---

1. As well as litigation, the hedge-to-arrive controversy has generated academic debate. See Nich-

mary judgment, three grain elevators have put this question, and others, before the court, seeking to dispose of nearly all of one producer's claims against them. If the HTAs in question here are indeed illegal futures contracts, the plaintiff grain producer, and possibly hundreds or thousands of other grain producers with similar contracts, will be relieved of any obligation to deliver grain under the contracts. If, however, the HTAs are valid cash forward contracts, the ultimate question in this and many other lawsuits will continue to be whether the grain elevators or the grain producers have breached their obligations under the contracts.

## I. BACKGROUND

### A. Factual Background

The court will discuss here only the nucleus of pertinent facts for this litigation. In its legal analysis, the court will address where necessary the parties' assertions of genuine issues of material fact that may preclude summary judgment in favor of the defendant grain elevators.

Plaintiff Bradley K. Oeltjenbrun is and has been for many years a grain farmer in Cerro Gordo County in central Iowa. His annual corn production in a typical year is about 100,000 bushels. Like hundreds, perhaps thousands, of other grain producers, Oeltjenbrun entered into several so-called HTA contracts with various grain elevators, including contracts with defendants Farmers Cooperative Society (FCS) and Farmers Cooperative Company (FCC). Oeltjenbrun also entered into one HTA with Burchinal Cooperative Society, a cooperative that has since sold the majority of its assets, including Oeltjebrun's HTA, to defendant Land O' Lakes. Land O' Lakes, FCS, and FCC wi'i be referred to collectively herein, where appropriate, as the Elevators. The fourth defendant in the pres-

ent lawsuit, CSA Investors, Inc., is alleged to be an Iowa corporation that is or was engaged in the business of marketing crops for farmers.[2] Oeltjenbrun alleges that he entered into the HTAs with the Elevators on the advice of CSA and based on CSA's representations about the benefits of such contracts and the way in which they would work. The parties agree that any representations made to Oeltjenbrun about the HTAs were made by a representative of CSA, but they disagree over whether CSA was acting as the Elevators' agent in making those representations.

More specifically, on February 22, 1995, Oeltjenbrun entered into grain contract no. 1246,[3] now held by defendant Land O' Lakes, with Burchinal Cooperative Society, under which he agreed to deliver 60,000 bushels of corn, at a price of $2.70 per bushel, in July of 1996. LOL Ex. F. Oeltjenbrun also entered into three contracts denominated as "hedge-to-arrive" contracts and a fourth "grain contract" with Farmers Cooperative Society (FCS), as follows: (a) contract no. 453, FCS Ex. A, dated June 6, 1995, for delivery "at a later date" of 10,000 bushels of corn, with delivery date and price to be determined later, but pursuant to a schedule indicating an initial delivery date in December of 1995, and a Chicago Board of Trade (CBT) reference price of $2.82¼ per bushel; (b) contract no. 534, FCS Ex. B, dated October 26, 1995, for delivery "at a later date" of 10,000 bushels of corn, with delivery date and price to be determined later, but pursuant to a schedule indicating initial delivery in June of 1996, and a CBT reference price of $3.35 per bushel; (c) contract no. 537, FCS Ex. C, dated November 1, 1995, for delivery "at a later date" of 10,000 bushels of corn, with delivery date and price to be determined later, but pursuant to a schedule indicating an initial delivery date in May of 1996, and a CBT reference price of $3.40 per bushel; and (d) "grain

olas P. Iavarone, *Understanding the Hedge–To–Arrive Controversy*, 2 Drake J. Agric. L. 371 (Winter 1997); David C. Barrett, Jr., *Hedge–To–Arrive Contracts*, 2 Drake J. Agric. L. 153 (Spring 1997); Matthew J. Cole, *Hedge–To–Arrive Contracts: The Second Chapter of the Farm Crisis*, 1 Drake J. Agric. L. 243 (Winter 1996).

**2.** Although CSA accepted service on November 4, 1996, CSA has never answered the complaint in this matter, nor sought an extension of time to do so.

**3.** The printed caption of this contract is "Grain Contract," but "Hedge to Arrive" was handwritten onto the top of the contract at some point.

contract" no. 698, FCS Ex. D, dated September 22, 1995, for delivery of 5,000 bushels of corn, at a price of $2.85 per bushel, in April of 1996. Finally, Oeltjenbrun entered into three contracts, each denominated as a "hedge to arrive contract," with defendant Farmers Cooperative Company (FCC) as follows: (a) contract no. 157, FCC Ex. A, dated June 26, 1995, for delivery of 20,000 bushels in June of 1996, with no "cash price" yet determined for "arrival," but with a "Futures Option Price" of $2.85½ per bushel; (b) contract no. 167, FCC Ex. B, dated July 6, 1995, for delivery of 10,000 bushels of corn in June of 1996, with no "cash price" yet determined for "arrival," but with a "Futures Option Price" of $2.97½ per bushel; and (c) contract no. 193, FCC Ex. C, dated September 7, 1995, for delivery of 5,000 bushels of corn in May of 1996, with no "cash price" yet determined for "arrival," but with a "Futures Option Price" of $3.01 per bushel.[4]

Oeltjenbrun "rolled" each of his HTAs to later delivery dates at least once, sometimes several times. Notations on his HTA with Burchinal indicate that on June 27, 1996, after Land O' Lakes had acquired Oeltjenbrun's HTA with Burchinal, Oeltjenbrun and Land O' Lakes agreed that Oeltjenbrun could "roll" the delivery date on the remaining 42,608.12 bushels outstanding on the contract from July of 1996, at $2.70 per bushel, to December of 1996, at $1.45 per bushel. LOL Ex. F. Land O' Lakes and Oeltjenbrun disagree over who requested or required the roll. On June 27, 1996, Land O' Lakes sent Oeltjenbrun a confirmation of the roll, LOL Ex. G, requesting that Oeltjenbrun notify Land O' Lakes within five days if the notation of the roll did not reflect the parties' arrangement. The record contains no indication that Oeltjenbrun ever contradicted the terms of the roll as stated in the confirmation. Land O' Lakes asserts that Oeltjenbrun provided assurances to Land O' Lakes that he intended to deliver grain pursuant to the contract, but Oeltjenbrun ultimately sold his grain to another elevator, because,

Oeltjenbrun explains, he was then involved in litigation with Land O' Lakes.

Oeltjenbrun's HTAs with FCS indicate each contract was "rolled" several times. Contract no. 453, FCS Ex. A, was rolled from a delivery date in December of 1995, at a CBT reference price of $2.82¼, to March of 1996, to May of 1996, to July of 1996, to September of 1996, to December of 1996, at a CBT reference price of $1.2125 per bushel. This contract was "unpriced" on September 23, 1996. Contract no. 534, FCS Ex. B, was rolled from June of 1996, at a CBT reference price of $3.35 per bushel, to September of 1996, to December of 1996, at a CBT reference price of $1.99½ per bushel. This contract was "unpriced" on September 23, 1996. Contract no. 537, FCS Ex. C, was rolled from May of 1996, at a CBT reference price of $3.40 per bushel, to July of 1996, to September of 1996, to December of 1996, at a CBT reference price of $1.76½ per bushel. This contract was also "unpriced" on September 23, 1996. Contract no. 698, FCS Ex. D, was not described as a "hedge to arrive," but as a "grain contract," and was never "rolled." However, Oeltjenbrun has not actually delivered any grain on any of his HTAs or his grain contract with FCS.

Oeltjenbrun was also allowed to roll each of his HTAs with FCC, but in each case by canceling the original contract and entering into a new contract with a different initial "Arrival Period" and "Futures Option Price." Contract no. 157, FCC Ex. A, dated June 26, 1995, for delivery of 20,000 bushels in June of 1996, with a "Futures Option Price" of $2.85½ per bushel, was rolled to contract no. 303, FCC Ex. G, dated July 19, 1996, with an "Arrival Period" of "Oct–Nov 1996," and a "Futures Option Price" of $1.24½ per bushel. Oeltjenbrun did not sign contract no. 303. According to a supplemental affidavit of Charles Schafer, the manager of FCC, Schafer rolled contract no. 157 to contract 303 upon Oeltjenbrun's failure to deliver in June in accordance with the contract and upon

---

4. FCC has submitted a fourth contract, contract no. 158, FCC Ex: D, dated June 28, 1995, which is an HTA contract for 30,000 bushels of corn to be delivered in November of 1995. According to notations on that contract and the affidavit of

Charles Schafer, FCC Ex. E, that contract was rolled to March of 1996, and Oeltjenbrun actually delivered the 30,000 bushels of corn to which the contract refers in March of 1996.

oral notice from Oeltjenbrun that he planned to roll the contract to the new crop year to "clean up" his obligations. FCC Ex. M (Supplemental Affidavit of Charles Schafer), p. 2. Contract no. 167, FCC Ex. B, dated July 6, 1995, for delivery of 10,000 bushels of corn in June of 1996, with a "Futures Option Price" of $2.97½ per bushel, was rolled to contract no. 302, FCC Ex. H, dated July 2, 1996, with an "Arrival Period" of "Oct–Nov 1996," with a "Futures Option Price" of $1.79½ per bushel. This roll was made by Charles Schafer upon Oeltjenbrun's oral authorization on June 28, 1996. FCC Ex. M (Supplemental Affidavit of Charles Schafer), p. 2. Contract no. 302 was then rolled to contract no. 310, FCC Ex. I, dated September 12, 1996, with an "Arrival Period" of "Oct–Nov 1996," but with a change in the "Futures Option" from September of 1996 to December of 1996, and resulting change in "Futures Option Price" to $1.42½ per bushel. This roll was made by Schafer after Oeltjenbrun failed to deliver and stopped communicating with FCC. FCC Ex. M (Supplemental Affidavit of Charles Schafer), p. 2. According to Schafer, he rolled the contract to afford Oeltjenbrun an opportunity to deliver on the contract. *Id.* Contract no. 193, FCC Ex. C, dated September 7, 1995, for delivery of 5,000 bushels of corn in May of 1996, with a "Futures Option Price" of $3.01 per bushel, was rolled to contract no. 281, FCC Ex. J, dated May 28, 1996, with an "Arrival Period" of "July 1996," and a "Futures Option Price" of $2.87 per bushel. Oeltjenbrun authorized this roll in writing, FCC Ex. M (Supplemental Affidavit of Charles Schafer), p. 2, and signed the new contract. This contract was rolled yet again by Schafer when Oeltjenbrun quit communicating with FCC, FCC Ex. M (Supplemental Affidavit of Charles Schafer), p. 2, to contract no. 305, FCC Ex. K, dated July 19, 1996, and apparently consolidated with other contracts, because the new contract lists a quantity of 47,666.12 bushels, with an "Arrival Period" of "Oct–Nov 1996," and a "Futures Option Price" of $1.28 per bushel. Of all the contracts to which the original HTAs were rolled, only contract no. 281, FCC Ex. J, is signed by Oeltjenbrun.

Facts that are pertinent particularly to Land O' Lakes' motion for partial summary judgment concern the circumstances under which Land O' Lakes obtained Oeltjenbrun's HTA and other assets of Burchinal Cooperative Society. On February 29, 1996, Land O' Lakes purchased some, but not all, of Burchinal's assets for $1,122,839.72 pursuant to a contract identified as an Agreement of Purchase and Sale. However, Land O' Lakes did not purchase or exchange any stock in connection with this transaction. Rather, Land O' Lakes acquired sole and exclusive ownership of the assets purchased from Burchinal and Burchinal retained no ownership interest in any of those assets or in the Burchinal elevator facility. The Agreement of Purchase and Sale between Burchinal and Land O' Lakes contains the following clause concerning Burchinal's debts and liabilities:

3.6 *Liabilities Not Assumed.* It is understood and agreed that Purchaser is Purchasing and Seller is selling only assets, and that Purchaser is not purchasing, receiving or assuming any contract, obligation or liability of any nature or kind whatsoever, or in any way connected with the business of Seller other than as specifically set forth herein.

Land O' Lakes did purchase Burchinal's rights under certain grain contracts, including Oeltjenbrun's HTA with Burchinal. Land O' Lakes hired some of Burchinal's former employees, but replaced the entire management of the Burchinal elevator after the transaction. However, Burchinal's patrons became "members" of the Land O' Lakes cooperative, and three seats on the cooperative's Advisory Board were to be filled by Burchinal members.

### B. Procedural Background

Oeltjenbrun filed the present lawsuit on September 19, 1996, naming as defendants CSA, Land O' Lakes, FCS, and FCC. He filed an amended and substituted complaint on October 4, 1996. In Count I of his amended complaint, Oeltjenbrun seeks declaratory judgment that the HTAs he has entered into are void, voidable, and unenforceable, because they are illegal off-exchange futures contracts under the CEA. In Count II, Oeltjenbrun alleges fraud by all defendants in violation of the CEA, based on

misrepresentations about the HTA contracts by a representative of CSA, purportedly acting as an agent of the Elevators. He seeks as relief on this count rescission of the HTAs. Count III of the amended complaint also alleges fraud by all defendants in violation of the CEA, but this time seeks actual and punitive damages as relief. Count IV of the amended complaint states a common-law claim of fraudulent misrepresentation against all defendants, and seeks rescission of the HTAs as relief. Count V is another common-law claim of fraudulent misrepresentation against all defendants, but it seeks actual and punitive damages as relief. Count VI is a common-law claim of negligent misrepresentation against all defendants and seeks actual and punitive damages as relief. Count VII alleges breach of the HTA contracts by the Elevators. Count VIII alleges breach of fiduciary duty by all of the defendants. Count IX, against CSA only, alleges negligence in violation of duties purportedly imposed upon CSA by title 17 of the Code of Federal Regulations and seeks actual damages as relief.

The Elevators each answered Oeltjenbrun's complaint and asserted counterclaims. Although defendant CSA accepted service of the complaint on November 4, 1996, it has never answered the complaint. Land O' Lakes answered the complaint on October 21, 1996, asserting several affirmative defenses and a counterclaim consisting of counts alleging breach of contract, estoppel, unjust enrichment, and misrepresentation of Oeltjenbrun's intent to deliver grain on his HTA with Land O' Lakes. On November 7, 1996, FCC filed its answer and asserted affirmative defenses. FCC was later granted leave to file a counterclaim, which it did on December 12, 1997, asserting, as had Land O' Lakes, breach of contract, estoppel, unjust enrichment, and misrepresentation. FCS answered Oeltjenbrun's complaint on January 6, 1997, also asserting affirmative defenses and a counterclaim seeking to recover damages resulting from Oeltjenbrun's repu-

diation of his HTAs with FCS. Oeltjenbrun has answered each of the counterclaims and has asserted affirmative defenses.

Eventually, on December 23, 1997, Land O' Lakes moved for partial summary judgment on Oeltjenbrun's claims in Counts I, II, III, V, VI, VII, VIII,[5] and Oeltjenbrun's affirmative defense to Land O' Lakes' counterclaim in which Oeltjenbrun reasserted his contention that his HTA with Land O' Lakes was an illegal futures contract. Then, on March 4, 1998, FCS moved for partial summary judgment on Oeltjenbrun's claims in Counts I through III and his affirmative defense asserting the illegality of the HTAs in question. On March 13, 1998, FCC joined in Land O' Lakes' motion for partial summary judgment and asserted its own motion for summary judgment on the same claims and defenses challenged by Land O' Lakes.

The court heard oral arguments on the motions for partial summary judgment on March 27, 1998. Plaintiff Bradley K. Oeltjenbrun was represented by counsel Steven P. Wandro of Wandro & Gibson, P.C., in Des Moines, Iowa. Defendant Land O' Lakes was represented by counsel Jonathan C. Miesen of Doherty, Rumble & Butler in St. Paul, Minnesota. Defendant FCS was represented by counsel Brenton D. Soderstrum of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, PLC, in Des Moines, Iowa. Defendant FCC was represented by counsel Joel J. Yunek of Laird, Heiny, McManigal, Winga, Duffy & Stambaugh, PLC, in Mason City, Iowa. Defendant CSA did not appear. The skillfully presented oral arguments were fruitful and informative, doing much to clarify the parties' positions and the record.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P.

---

**5.** Land O' Lakes did not include Count IV, a common-law fraud claim like that asserted in Count V, but seeking rescission rather than damages, in its motion for partial summary judgment. No explanation for this omission has been offered and it seems likely that the omission is simply an oversight, because the impediments Land O' Lakes asserts to the fraud claim in Count V apply with equal force to the fraud claim in Count IV.

56 in a number of recent decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1229–32 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Center,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim … is asserted … may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.… *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(b) & (c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.

Furthermore, in *Coonley v. Fortis Benefit Ins. Co.,* 956 F.Supp. 841 (N.D.Iowa 1997), *aff'd,* 128 F.3d 675 (8th Cir.1997), this court recognized that primarily legal issues generally, and contract interpretation questions specifically, are issues amenable to summary disposition. *Coonley,* 956 F.Supp. at 844; *accord Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1326 (8th Cir.1995) (in an ERISA plan interpretation case, the court observed, "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate," citing *Crain v. Board of Police Comm'rs,* 920 F.2d 1402, 1405–06 (8th Cir.1990)); *Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 564–65 (7th Cir.1995) ("Summary judgment is particularly appropriate in cases involving the interpretation of contracts."); *Mumford v. Godfried,* 52 F.3d 756, 759 (8th Cir.1995) ("Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."); *McPeek v. Beatrice Co.,* 936 F.Supp. 618, 626 (N.D.Iowa 1996) (ERISA contract interpretation case before the court on summary judgment which quotes *Murphy,* 61 F.3d at 564–65). Similarly, this court has also concluded that statutory interpretation—particularly interpretation of the effect of a statute where facts are undisputed—is primarily a legal question amenable to summary judgment. *See Prudential Ins. Co. of Am. v. Rand & Reed Powers Partnership,* 972 F.Supp. 1194, 1202–03 (N.D.Iowa 1997), *aff'd,* 141 F.3d 834 (8th Cir.1998); *accord United States v. Carr,* 66 F.3d 981, 983 (8th Cir.1995) (statutory interpretation is a question of law reviewed *de novo* ); *United States v. Moore,* 38 F.3d 977, 979 (8th Cir.1994) (the task of statutory interpretation "is one best placed in the hands of the trial judge," because it is a question of law); *United States v. Brummels,* 15 F.3d 769, 771 (8th Cir.1994) (explaining that, while findings of fact is reviewed for clear error, "[a]s to application of facts to the legal interpretation of [a statute], the stan-

dard of review is *de novo* "). Thus, because some of the issues before the court are essentially legal—contract and statutory interpretation—summary disposition may be particularly appropriate. See *Coonley,* 956 F.Supp. at 845.

With these standards in mind, the court turns to consideration of the defendants' motions for partial summary judgment on many of Oeltjenbrun's claims. The court will consider the Elevators' motions for partial summary judgment on each claim in turn, beginning with Oeltjenbrun's claim for declaratory judgment, as a disposition favorable to the Elevators on that claim will also entitle them to summary judgment on other claims under the CEA.

### B. The Declaratory Judgment Claim

### 1. The Declaratory Judgment Act

Congress has provided for declaratory judgments by the federal courts through two provisions of the Declaratory Judgment Act, which state, in pertinent part, the following:

**§ 2201. Creation of remedy**

(a) In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

\* \* \* \* \* \*

**§ 2202. Further relief**

■ Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

28 U.S.C. §§ 2201(a), 2202. The federal Declaratory Judgment Act "is a procedural statute, not a jurisdictional statute." *Missouri ex rel. Missouri Highway Transp. Comm'n v. Cuffley,* 112 F.3d 1332, 1334 (8th Cir.1997). Therefore, there must be some basis for federal jurisdiction other than the Declaratory Judgment Act. *Id.* The basis for federal juris-

diction over the Declaratory Judgment Act claim here is federal question jurisdiction, 28 U.S.C. § 1331, based on an alleged violation of the CEA.

In his declaratory judgment claim, Oeltjenbrun specifically asks the court "to declare the rights and other legal relations of [the] interested part[ies]" under his HTA contracts. 28 U.S.C. § 2201(a). He asks the court to declare the HTAs he has entered into with the Elevators void, voidable, and unenforceable, because they are illegal off-exchange futures contracts under the CEA. Thus, the court turns next to the CEA's prohibition on off-exchange futures contracts and the "cash forward" contract exception to that prohibition.

### 2. "Futures" and "cash forward" contracts under the CEA

The CEA has developed gradually into its present form from the Futures Trading Act of 1921, Pub.L. No. 67-66, 42 Stat. 187—which attempted to regulate boards of trade on which futures trading occurred, but which the Supreme Court held to be an unconstitutional exercise of the taxing power in *Hill v. Wallace,* 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922)—and the Grain Futures Act of 1922, Pub.L. No. 67-331, 42 Stat. 998—which derived its authority from the broad powers granted to Congress under the Commerce Clause. *Salomon Forex, Inc. v. Tauber,* 8 F.3d 966, 970 (4th Cir.1993), *cert. denied,* 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994); *see also In re Grain Land Coop Cases,* 978 F.Supp. 1267, 1273 (D.Minn.1997) (discussing in more detail the development of the CEA). "Today the CEA establishes a comprehensive system for regulating futures contracts and options." *Salomon Forex, Inc.,* 8 F.3d at 970.

### a. "Futures" contracts

Although the CEA may provide a comprehensive regulatory system for futures contracts, " 'futures contracts' and 'cash forward contracts' are terms of art which do not appear in the [CEA]." *Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 772 n. 4 (9th Cir.1995), *cert. denied sub nom. Schulze v. Commodity Fu-*

*tures Trading Comm'n,* —— U.S. ——, 117 S.Ct. 64, 136 L.Ed.2d 26 (1996); *Salomon Forex, Inc.,* 8 F.3d at 971 (noting that "futures contract" is "never precisely defined by statute," nor is "cash forward contract"). Rather, the CEA defines "contract of sale" to include "sales, agreements of sale, and agreements to sell," 7 U.S.C. § 1a(6), and provides the Commodity Futures Trading Commission (CFTC) with "exclusive jurisdiction" over "contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(i); *Noble Metals Int'l, Inc.,* 67 F.3d at 772. Furthermore, the CEA provides that such "contracts of sale of a commodity for future delivery," *i.e.,* futures contracts, must be offered or sold on commission-designated boards of trade, or they are illegal, "off-exchange" contracts. 7 U.S.C. § 6(a); [6] *Noble Metals Int'l, Inc.,* 67 F.3d at 772; *Salomon Forex, Inc.,* 8 F.3d at 970 ("[The CEA] provides at its core that no person shall enter into, or offer to enter into, a transaction involving the sale of a "commodity for future delivery," unless it is conducted on or through a board of trade designated and regulated by the [CFTC] as an exchange ('contract market')," citing 7 U.S.C. §§ 2 & 6); *In re Bybee,* 945 F.2d 309, 312 (9th Cir.1991) (citing 7 U.S.C. § 6(a)).

Futures contracts, the Ninth Circuit Court of Appeals has explained,

> enable[ ] an investor to hedge the risk that the price of the commodity will change between the date the contract is entered and the date delivery is due—without having to take physical delivery of the commodity. *CFTC v. Co Petro Mktg. Group, Inc.,* 680 F.2d 573, 579–80 (9th Cir.1982).

A futures contract provides that a specific amount of the commodity will be "deliv-

ered" to the buyer at a specified date (trade date) at an agreed-upon price. If the buyer does not want to take delivery of the commodity on the trade date, he enters an "off setting transaction" to sell the same amount of the commodity. *Id.* The investor's profit or loss depends upon the difference between the amount the investor contracted to pay for the commodity and what he gets for it when he sells it.

*Noble Metals Int'l, Inc.,* 67 F.3d at 772. Turning from the purpose of a "futures contract" to its characteristics, a "futures contract"

> is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed. To facilitate the development of a liquid market in these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss. The main purpose realized by entering into futures transactions is to transfer price risks from suppliers, processors and distributors (hedgers) to those more willing to take the risk (speculators). Since the prices of futures are contingent on the vagaries of both the production of the commodity and the economics of the marketplace, they are particularly susceptible to manipulation and excessive speculation.

*Salomon Forex, Inc.,* 8 F.3d at 971 (footnote omitted); *accord In re Bybee,* 945 F.2d at

---

**6.** Specifically, the CEA provides in § 6(a) that

> it shall be unlawful for any person to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office business anywhere in the United States, its territories or possessions, for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery ... unless—
>
> (1) such transaction is conducted on or subject to the rules of a board of trade which has been designated by the Commission as a "contract market" for such commodity;

> (2) such contract is executed or consummated by or through a member of such contract market; and
>
> (3) such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery; *Provided,* that each contract market member shall keep such record for a period of three years from the date thereof, or for a longer period if the Commission shall so direct, which record shall at all times be open to the inspection of any representative of the Commission or the Department of Justice.
>
> 7 U.S.C. § 6(a).

312 (" 'Commodity futures transactions involve standardized contracts for the purchase or sale of commodities which provide[ ] for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally are secured by earnest money, or "margin." ' *In re Stovall,* [1977–1980 Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 23,777. Each element need not be present for a transaction to be a futures contract. *Id.* Instead, '[t]he transaction must be viewed as a whole with a critical eye toward its underlying purpose.' *CFTC v. Co Petro Mktg. Group, Inc.,* 680 F.2d 573, 581 (9th Cir. 1982)."); *First Nat'l Monetary Corp. v. CFTC,* 860 F.2d 654, 657 (6th Cir.1988) (identifying similar characteristics of "futures" contracts).

### b. "Cash forward" contracts

█ Although the CEA regulates "futures contracts," the Act excludes from the definition of the term "future delivery" "any sale of any cash commodity for deferred shipment or delivery," 7 U.S.C. § 1a(11) (formerly 7 U.S.C. § 2, first paragraph), and hence excludes such contracts, known as "cash forward contracts," from the definition of futures contracts, and by extension, excludes them from CFTC jurisdiction and the ban on "off-exchange" contracts found in 7 U.S.C. § 6(a). *Noble Metals Int'l, Inc.,* 67 F.3d at 772. The reasons for the difference in treatment of the two kinds of contracts—"futures" contracts regulated under the CEA and "cash forward contracts" not so regulated—arises from the history of the CEA:

> Because the Act was aimed at manipulation, speculation, and other abuses that could arise from the trading in futures contracts and options, as distinguished from the commodity itself, Congress never purported to regulate "spot" transactions (transactions for immediate sale and delivery of a commodity) or "cash forward" transactions (in which the commodity is presently sold but its delivery is, by agreement, delayed or deferred). Thus § 2(a)(1)(A) of the Act, 7 U.S.C. § 2, provides that "futures" regulated by the Act do not include transactions involving actual physical delivery of the commodity, even

on a deferred basis. Transactions in the commodity itself which anticipate actual delivery did not present the same opportunities for speculation, manipulation, and outright wagering that trading in futures and options presented. From the beginning, the CEA thus regulated transactions involving the purchase or sale of a commodity "for future delivery" but excluded transactions involving "any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 2. The distinction, though semantically subtle, is what the trade refers to as the difference between "futures," which generally are regulated, and "cash forwards" or "forwards," which are not. *See generally* David J. Gilberg, *Regulation of New Financial Instruments under the Federal Securities and Commodities Laws,* 39 Vand. L.Rev. 1599, 1603–08 (1986) (discussing distinction between futures and forwards); Lewis D. Solomon & Howard B. Dicker, *The Crash of 1987: A Legal and Public Policy Analysis,* 57 Fordham L.Rev. 191, 193–96 (1988) (describing evolution of forwards and futures); [William L. Stein, *The Exchange–Trading Requirement of the Commodity Exchange Act,* 41 Vand.L.Rev. 473], 486–92 [ (1988) ] (detailing legislative history of forward/future distinction); Mark D. Young & William L. Stein, *Swap Transactions under the Commodity Exchange Act: Is Congressional Action Needed?,* 76 Geo. L.J.1917, 1923–24 (1988) (describing distinction between forwards and futures).

*Salomon Forex, Inc.,* 8 F.3d at 970–71. Thus, "[t]his 'narrow' exception [for cash forward contracts] is predicated on both parties contemplating and intending future delivery of the actual commodity when immediate delivery would be commercially impracticable." *Noble Metals Int'l, Inc.,* 67 F.3d at 772 (citing *Co Petro,* 680 F.2d at 578; *In re Bybee,* 945 F.2d at 313; and *In re Stovall,* [1977–1980 Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 23,777–778).

"Cash forward contracts" have different characteristics from futures contracts:

> In contrast to the fungible quality of futures, cash forwards are generally individually negotiated sales of commodities be-

tween principals in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity. These contracts are not readily transferable and therefore are usually entered into between parties able to make and receive physical delivery of the subject goods. *Salomon Forex, Inc.,* 8 F.3d at 971; *accord In re Bybee,* 945 F.2d at 313 ("Congress 'intended to cover [with the cash forward exclusion] only contracts for sale which are entered into with the expectation that delivery of the actual commodity will eventually occur through performance on the contracts.' *Stovall,* at 23,777. 'Although the desire to acquire or dispose of a physical commodity is the underlying motivation for entering such a contract, delivery may be deferred for purposes of convenience or necessity.' *Id.* at 23,778."). Furthermore, unlike a futures contract in which the commodity is of interest to the parties only as a means of speculation, to the parties to a cash forward contract, the commodity has an "inherent value": For example, the grain has an "inherent value" to the farmer who produced it as the source of his income and to the buyer, such as an elevator, because the elevator is in contact with potential buyers, such as the flour miller, and the elevator has the facilities to store, condition, and load out the grain and earn additional income from these services. *Co Petro Mktg. Group, Inc.,* 680 F.2d at 578.

However, "[m]ost important, both parties to the contracts deal in and contemplate future delivery of the *actual* grain." *Id.* (emphasis in the original). Indeed, in *Co Petro,* in the course of a survey of the legislative history of the CEA and its predecessors, the Ninth Circuit Court of Appeals opined,

> There is no indication that Congress drew this exclusion otherwise than to meet a particular need such as that of a farmer to sell part of next season's harvest at a set price to a grain elevator or miller. These cash forward contracts guarantee the farmer a buyer for his crop and provide the buyer with an assured price.

*Co Petro Mktg. Group,* 680 F.2d at 577–78; *see also In re Grain Land Coop Cases,* 978 F.Supp. at 1273 (also quoting this portion of

*Co Petro* ). Thus, whether a contract contemplates actual delivery has been a recurring theme in judicial determinations of whether or not a contract memorializes a cash forward transaction. *Noble Metals Int'l, Inc.,* 67 F.3d at 773 (focusing on the delivery requirement in terms of "physical transfer of the actual commodity"); *Salomon Forex, Inc.,* 8 F.3d at 971 ("cash forwards are generally individually negotiated sales of commodities between principals in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity"); *In re Bybee,* 945 F.2d at 313 (focusing on the actual delivery requirement); *Co Petro Mktg. Group, Inc.,* 680 F.2d at 578 (describing actual delivery as the "most important" element of a cash forward contract).

For example, in *Noble Metals Int'l, Inc.,* the Ninth Circuit Court of Appeals held that, to take advantage of the cash forward contract exception under the CEA, "the delivery requirement cannot be satisfied by the simple device of a transfer of title"; instead, the parties must "contemplate physical transfer of the actual commodity." *Noble Metals Int'l, Inc.,* 67 F.3d at 773. In an earlier decision, *In re Bybee,* although the Ninth Circuit Court of Appeals noted that whether or not there is public involvement in the transaction was certainly a characteristic to be considered in distinguishing between a "futures" contract and a "cash forward" contract, it was not the "sole determinant" of the status of the transaction. *In re Bybee,* 945 F.2d at 313. Instead, the court found that in the case before it, the determining factor was the concept of delivery. *Id.* The court then found that in prior precedent, it had required both "subjective intent as well as an objective showing of the delivery obligation." *Id.* (citing *Co Petro,* 680 F.2d at 578). Since its prior decision, the court found that the CFTC had issued three interpretive releases discussing the elements of a cash forward contract, each showing some development of the concept of cash forward contracts. *Id.* at 314. In the last of those interpretive releases, the "real innovation" was the CFTC's treatment of the delivery obligation. *Id.*

Acknowledging that commercial parties often agree to "bookout," or offset, the contractual delivery obligations, the CFTC concluded that

> while such agreements may extinguish a party's delivery obligation, they are separate, individually negotiated, new agreements, there is no obligation or arrangement to enter into such agreements, they are not provided for by the terms of the contracts as initially entered into, and any party that is in a position in a distribution chain that provides for the opportunity to book-out with another party or parties in the chain is nevertheless entitled to require delivery of the commodity to be made through it, as required under the contracts.

[*Statutory Interpretation Concerning Forward Transactions,* 55 Fed.Reg. 39188, 39192 (Sept. 25, 1990) ].

*In re Bybee,* 945 F.2d at 314. The Ninth Circuit Court of Appeals found that "great deference" was due the CFTC's interpretation of the CEA found in this *Statutory Interpretation,* which explained that " '[t]he underlying postulate of the exclusion is that the Act's regulatory scheme for futures trading simply should not apply to private commercial merchandising transactions *which create enforceable obligations to deliver* but in which delivery is deferred for reasons of commercial convenience or necessity.' " *Id.* at 315 (quoting *Statutory Interpretation,* 55 Fed.Reg. at 39190, with emphasis added by the Ninth Circuit Court of Appeals). Therefore, where the parties before it had a legal obligation to make or take delivery upon demand of the other, the contracts creating those obligations were outside of the scope of § 2 of the CEA. *Id.*

### 3. Which kind of contracts?

The Elevators all contend that every court to reach the merits of the question has held that HTAs like theirs with Oeltjenbrun are valid cash forward contracts excluded from the purview of the CEA. *See In re Grain Land Coop Cases,* 978 F.Supp. 1267 (D.Minn. 1997); *Bunker v. Farmers Elevator of Hopkins,* No. 97–0137–CV–W–SOW (W.D.Mo. Sept. 18, 1997); *Countrymark Cooperative, Inc. v. Smith,* 1997 WL 762813 (Ohio Ct.App. 1997) (unpublished), *appeal not allowed,* 81 Ohio St.3d 1496, 691 N.E.2d 1058 (1998) (table op.); *Countrymark Cooperative, Inc. v. Johnstown Elevator, Inc.,* No. 96CVH07–5002 (Ohio Ct. Com. Pleas Jan. 6, 1998); *Farmers Cooperative Elevator v. Heyes,* No. 23–493 (Iowa Dist.Ct. Dec. 23, 1997). The one court to reach a different result, they contend, held only that, upon a motion to dismiss, the plaintiff had stated a claim that the contracts in question were illegal, "off-exchange" futures contracts, but that court did not hold as a matter of law that the HTAs in question were indeed illegal futures contracts. *See Eby v. Producers Co-op, Inc.,* 959 F.Supp. 428 (W.D.Mich.1997). Drawing on case law, the Elevators each contend that their contracts with Oeltjenbrun have all of the essential characteristics of cash forward contracts: The underlying purpose of the contracts is the sale and purchase of actual grain between a seller engaged in the business of producing grain and a buyer engaged in the business of buying grain; the contracts have "inherent value" to the parties; the parties intended physical delivery of the grain and coupled to that intent was the ability to make or receive actual delivery of the grain; and the contracts were individually negotiated transactions for the actual delivery of grain.

Oeltjenbrun concedes that if the court views the critical question to be whether the contracts require actual delivery of grain, his contracts with the Elevators would qualify as cash forward contracts. However, he urges the court instead to focus on the purpose of the CEA and hence on the degree of risk and speculation involved in the contracts to reach the right result. With that focus, he asserts that "it's the roll" that makes these contracts futures contracts. He argues that the HTAs in question here do not constitute valid cash forward contracts, because they do not require actual delivery within the crop year, but instead allow rolling of delivery beyond the next crop year, dramatically increasing the speculative nature of the contracts, the risks involved, and making the delivery obligation "diffuse" and "indeterminate." Furthermore, he contends, rolling results in fu-

tures transactions without parallel physical transactions of grain, thus establishing the speculative nature of the contracts. Oeltjenbrun relies not on case law, but on a recent interpretive letter from the CFTC, Interpretive Letter No. 96–41, *Division of Economic Analysis Statement of Policy in Connection with the Unwinding of Certain Existing Contracts for the Delivery of Grain and Statement of Guidance Regarding Certain Contracting Practices*, [Current Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶ 26,691 (CFTC May 15, 1996) (hereinafter CFTC May 15, 1996 *Statement of Policy* )—to which he argues great deference is due—as establishing that the HTAs in question do not fall within the cash forward contract exception to CEA regulation. He contends that the contracts in question fail each of the test factors in that *Statement of Policy:* They do not require mandatory delivery of specified quantities and grades of grain at a specific location and reference price by a specified date within the crop year during which the crop was harvested; they are not, in aggregate, for a quantity of grain that is reasonably related to his annual production; they do not specify a delivery date and futures contract month reference price that coincides with the crop year during which the grain would be harvested; and they permit "rolling" beyond the same crop year in which the grain was to be harvested. The rolling, he contends, results in a crop price that bears no relationship to the value of the grain, and hence demonstrates that the contracts are entirely tools for speculation.

In determining whether a contract is a *futures contract* or a *cash forward contract*, courts have cautioned that " '[s]elf-serving labels that the defendants choose to give their contracts should not deter the conclusion that their contracts, as a matter of law, [are futures contracts subject to the CEA].' " *Noble Metals Int'l, Inc.*, 67 F.3d at 773 (quoting *Commodity Futures Trading Comm'n v. American Metal Exch. Corp.*, 693 F.Supp. 168, 192 (D.N.J.1988), in turn quoting *CFTC v. Morgan, Harris & Scott Ltd.*, 484 F.Supp. 669, 675 (S.D.N.Y.1979)). As the Ninth Circuit Court of Appeals observed some years ago, in determining whether a contract of sale of a commodity is a futures contract or a cash forward contract, "no bright-line definition or list of characterizing elements is determinative. The transaction must be viewed as a whole with a critical eye toward its underlying purpose." *Co Petro Mktg. Group, Inc.*, 680 F.2d at 581. It is readily apparent here that the contracts in question are not identical; thus, the court must view *each* transaction or group of transactions separately. Because each of the defendants has a somewhat different kind of contract with Oeltjenbrun, the results of the court's analysis may differ for each defendant.

### a. The Land O' Lakes contract

The Land O' Lakes contract—actually the Burchinal contract purchased by Land O' Lakes with other of Burchinal's assets—is the simplest of the lot. A facsimile of the contract follows:

FRONT BACK

LOL Ex. F. It is not clear when the handwritten notation "Hedge to Arrive" was added to the contract.

This contract plainly contemplates actual physical delivery of a specified amount of grain to a specified location at a specified price during a specified period of time. *Noble Metals Int'l, Inc.*, 67 F.3d at 773 (considering contemplation of actual physical delivery of grain as a characteristic of a cash forward contract); *Salomon Forex, Inc.*, 8 F.3d at 971 (same); *In re Bybee*, 945 F.2d at 313 (same); *Co Petro Mktg. Group, Inc.*, 680 F.2d at 578 (same). It states that Oeltjenbrun "has this day contracted and sold" 60,000 bushels of corn at $2.70 per bushel to be delivered in July of 1996 to the "BCS" elevator. LOL Ex. F. Indeed, it appears that Oeltjenbrun actually made delivery of 17,391.88 bushels of corn, because the contract was "rolled" only for the remaining 42,608.12 he could not deliver in July of 1996. *See* LOL Ex F. (handwritten notations on front and back); Aff. of Bradley Oeltjenbrun In Support of His Resistance To Land O' Lakes' Motion For Partial Summary Judgment, p 2; Oeltjenbrun's Statement of Material Facts, p. 3, ¶ 3. Furthermore, the contract specifies terms for shortage, overage, damage, and freedom of the grain from en-

cumbrances, as well as other contingencies only relevant to the actual delivery of grain, such as transportation, breakdown of the elevator facilities, or the possibility that the elevator will be full "on date Seller wishes to make delivery." *Id.* The contract is also between a seller engaged in the business of producing grain and a buyer engaged in the business of buying grain and involves individually negotiated terms of amount, price, and delivery date. *Salomon Forex, Inc.*, 8 F.3d at 971 ("cash forwards are generally individually negotiated sales of commodities between principals"). Furthermore, because the contract is between a grain producer and a grain elevator, the contract was entered into between parties able to make and receive physical delivery of the subject goods. *Id.* The grain contract clearly has "inherent value" to each of the parties: to Oeltjenbrun because it provides for sale of a substantial share of his annual crop, and to the elevator because it provides the source of a supply of grain for the elevator's business. *Co Petro Mktg. Group, Inc.*, 680 F.2d at 578 (examining the "inherent value" of the contract to the parties). Altogether, the "nature" of the contract is an individual transaction for the purchase and sale—and subsequent actual delivery—of grain. In the face of Land O' Lakes' evidence that, even after it permitted Oeltjenbrun to "roll" delivery of some of the grain due under the contract, Oeltjenbrun gave assurances that he would ultimately deliver the remaining grain, Oeltjenbrun has presented no evidence suggesting that the parties never intended grain to be delivered on the contract.

■ As to "rolling," the contract itself is silent, neither permitting, forbidding, or in any way contemplating rolling in its original terms. Oeltjenbrun concedes that this contract, as written, would be a classic example of a cash forward transaction for the sale and purchase of grain for deferred delivery. However, he contends that this contract was *administered* like a futures contract, because Oeltjenbrun was permitted to roll the contract to the next crop year.

It appears that by separate agreement in June of 1996, Oeltjenbrun and Land O' Lakes agreed that Oeltjenbrun could "roll" 42,608.12 bushels of grain still due under the contract from the July 1996 delivery date to a delivery date in December of 1996. The mere fact that the parties, by separate agreement, permitted a roll on the contract does not make the original contract an illegal, off-exchange futures contract, anymore than labeling the contract at some point as a "Hedge to Arrive" contract made it a cash forward one. *Noble Metals Int'l, Inc.*, 67 F.3d at 773 (" '[s]elf-serving labels that the defendants choose to give their contracts should not deter the conclusion that their contracts, as a matter of law, [are futures contracts subject to the CEA],' " quoting *American Metal Exch. Corp.*, 693 F.Supp. at 192, in turn quoting *Morgan, Harris & Scott Ltd.*, 484 F.Supp. at 675). The roll permitted here is similar to the "bookout" agreements the Ninth Circuit Court of Appeals found the CFTC countenanced in *In re Bybee*, 945 F.2d at 314. Like "bookout" agreements, the agreement to roll the Burchinal contract was a separate, individually negotiated, new agreement; there was no obligation or arrangement to enter into such an agreement in the original contract; the agreement to roll was not provided for by the terms of the contract as initially entered into; and Land O' Lakes was entitled to demand delivery, and Oeltjenbrun was entitled to make delivery, pursuant to the terms of the original contract. *In re Bybee*, 945 F.2d at 314 (citing *Statutory Interpretation Concerning Forward Transactions*, 55 Fed.Reg. 39188, 39192 (Sept. 25, 1990), which concluded that, for these reasons, "bookout" agreements did not negate the delivery requirement and did not change cash forward contracts into illegal futures contracts). Furthermore, the obligation to make actual delivery of corn in December of 1996, after the roll, remained just as real and binding as the delivery obligation was in the original contract, because rolling was a matter of forbearance by Land O' Lakes on a demand for timely delivery, not a matter of right by Oeltjenbrun.

Thus, the court concludes that, as a matter of law, Land O' Lakes' contract no. 1246 with Oeltjenbrun is a cash forward contract—*i.e.*, a contract for "sale of any cash commodity for deferred shipment or delivery," 7 U.S.C. § 1a(11)—that falls outside the purview of

the CEA.[7] *Noble Metals Int'l, Inc.*, 67 F.3d at 772 ("contracts of sale of a commodity for future delivery," *i.e.*, futures contracts, must be offered or sold on commission-designated boards of trade, or they are illegal, "off-exchange" contracts); *Salomon Forex, Inc.*, 8 F.3d at 970 ("[The CEA] provides at its core that no person shall enter into, or offer to enter into, a transaction involving the sale of a "commodity for future delivery," unless it is conducted on or through a board of trade designated and regulated by the [CFTC] as an exchange ('contract market')," citing 7 U.S.C. §§ 2 & 6); *In re Bybee*, 945 F.2d 309, 312 (9th Cir.1991) (citing 7 U.S.C. § 6(a)). As a consequence of this conclusion on the issue directly presented in Oeltjenbrun's Count I for declaratory judgment, Land O' Lakes is entitled to summary judgment in its favor not only on Count I, but also on Counts II and III, which are claims for fraud also brought under the CEA, and Oeltjenbrun's affirmative defense to Land O' Lakes' counterclaim in which Oeltjenbrun reasserted his contention that his HTA with Land O' Lakes was an illegal futures contract.

### b. The FCS contracts

■■■ Although the manner in which the contracts Oeltjebrun had with FCS are labeled is of no consequence to the court's determination of whether they fit within the cash forward exception to the CEA, *see Noble Metals Int'l, Inc.*, 67 F.3d at 773, it is nonetheless helpful to keep track of the contracts under discussion to note the way in which they are labeled. Three of the FCS contracts, nos. 453, 534, and 537, FCS Exs. A, B, and C, are labeled "GRAIN CONTRACT—HEDGE–TO–ARRIVE—FOR FUTURE DELIVERY." The fourth FCS contract at issue, however, is denominated simply a "GRAIN CONTRACT." FCS Ex. D (contract no. 698).

Each of the FCS contracts denominated as a "HEDGE–TO–ARRIVE" has identical terms except as to some of the handwritten terms, which are shown below by underlining; hence, only FCS Ex. A, contract no. 453, is quoted here, with paragraph numbering by the court:

[1.] This is to certify that 4802 Brad Oeltjenbrun agrees to deliver at a later date 10,000.00 bushels of corn to be clean, sound and dry and Grade No. 2 and be delivered to the Farmers Co-op Society at Garner, IA. Seller certifies that the grain in his possession is free and clear of all liens and incumbrances. The final price to be established by the schedule below. The delivery period will be established by the seller at a later date. This contract will not be written for more bushels than the seller can produce in a normal year.

[2.] This hedge to arrive contract allows the seller to establish the CBT price but not the basis. Basis being the difference between the CBT and the cash price at the elevator writing this contract, for the delivery of this contract. The CBT price can only be established during normal trading hours of the CBT.

[3.] The seller must establish the basis of this contract before delivery or 15 days before first notice day of the option month governing this contract which ever [sic] comes first. Unless other terms have been agreed upon by both BUYER and SELLER before said term, BUYER shall have the authority to set the basis to establish the cash price of said grain.

[4.] The seller will have the right to spread/roll to a new option month which must be done during normal trading hours of the CBT.

---

7. Even supposing, as Oeltjenbrun contends, that the court must give great deference to the factors listed in the CFTC's May 15, 1996, *Statement of Policy*, this contract would fit within that document's definition of a cash forward contract: It requires delivery of a specified quantity and grade of grain, 60,000 bushels of grade 2 corn, at a specific location, the BCS elevator, and reference price, $2.70 per bushel, by a specified date within the crop-year during which the crop was harvested, July of 1996; it is for a quantity reasonably related to Oeltjenbrun's annual production, consisting of approximately 60% of his typical year's harvest, to be delivered at a location where Oeltjenbrun would normally be able to make delivery; it specifies a delivery date and futures contract month reference price, July of 1996, that coincides with the crop year during which the grain would be harvested; and it does not, by its plain terms, permit rolling at all, let alone beyond the crop year. *Cf.* CFTC May 15, 1996, *Statement of Policy*.

[5.] The seller will have the right to unprice the contract, but repricing will have to take place before actual delivery of said grain. Any unpricing or repricing shall be done during normal trading hours of the CBT. Any negative equity at the time of unpricing must be paid in full to the BUYER. Any positive equity at the time of unpricing will be kept by the BUYER until final settlement of said grain.

[6.] Final pricing (setting of the basis) will be done at the quoted . bid for the applicable delivery period of this contract. Once final price has been established, all standard to-arrive contract terms will apply.

[7.] In the event it has been determined by both BUYER and SELLER that the contract bushels are undeliverable, the SELLER may elect to buy out of the contract at the net equity of the trade plus fees.

[8.] The fees governing this contract are as follows:

Initial Position .01 Spread/Rolling—1 cent
Undelivery buy back—10 cents plus costs
Repricing—1 cent Unpricing—1 cent

FCS Ex. A; *and compare* FCS Exs. B & C. Each contract indicates an initial CBT price and month of delivery, and notation of any "rolls" of the contract, and consequent changes in CBT price and delivery month, in the "schedule" referred to in the first paragraph of the contract. *Id.;* FCS Exs. B & C.

Again, these HTA contracts plainly contemplate the actual physical delivery of a specified amount of the commodity in question. *Noble Metals Int'l, Inc.,* 67 F.3d at 773 (considering contemplation of actual physical delivery of grain as a characteristic of a cash forward contract); *Salomon Forex, Inc.,* 8 F.3d at 971 (same); *In re Bybee,* 945 F.2d at 313 (same); *Co Petro Mktg. Group, Inc.,* 680 F.2d at 578 (same). Each states that Oeltjenbrun "agrees to deliver at a later date" a specified number of bushels of corn. *See, e.g.,* FCS Ex. A, ¶ 1. Furthermore, like the Burchinal contract, these contracts specify terms that are only relevant to the actual delivery of grain, such as the seller's certification that the grain is free from liens and encumbrances, a statement that each contract will not be written for more bushels

than the seller can produce in a normal year, and provisions governing buy out of the contract "[i]n the event it has been determined by both BUYER and SELLER that the contract bushels are undeliverable." *Id.* at ¶¶ 1 & 7. The pricing method for the grain is also dependent upon the seller's specification of a delivery date, *id.* at ¶¶ 1–3, 6, and once final pricing has been established, "all standard to-arrive contract terms will apply ." *Id.* at ¶ 6. The contracts are also between a seller engaged in the business of producing grain and a buyer engaged in the business of buying grain and each involves individually negotiated terms of amount, price, and delivery date. *Salomon Forex, Inc.,* 8 F.3d at 971 ("cash forwards are generally individually negotiated sales of commodities between principals"). Furthermore, because the contracts are between a grain producer and a grain elevator, the contracts were entered into between parties able to make and receive physical delivery of the subject goods. *Id.* Again, these contracts have "inherent value" to each of the parties: to Oeltjenbrun because they provide for sale of a portion of his annual crop, and to the elevator as the source of a supply of grain for its business. *Co Petro Mktg. Group, Inc.,* 680 F.2d at 578 (examining the "inherent value" of the contract to the parties). Thus, although these contracts differ from the Burchinal contract held by Land O' Lakes, the "nature" of these contracts is also that each is an individual transaction for the purchase and sale, and subsequent actual delivery, of grain.

Oeltjenbrun maintains that the "unlimited" rolling specifically permitted under provisions of these contracts, *see, e.g.,* FCS Ex. A at ¶ 4, transform them into illegal futures contracts, because rolling can occur beyond the crop year. Furthermore, he argues that the rolling of these contracts, requires futures transactions without parallel physical transactions of grain, because the elevator must close out its short positions taken to protect itself against non-delivery, and the costs of those futures transactions are passed on to the producer in the repricing of the rolled contract. Thus, he contends that the delivery price does not reflect the value of the grain at delivery, demonstrating the

speculative nature of the transactions. Oeltjenbrun contends these facts make the HTA contracts speculative, not merely contracts for actual delivery. Oeltjenbrun suggests that the district court in *In re Grain Land Co-op Cases* failed to recognize the significance of this aspect of HTA contracts. Oeltjenbrun also asserts that unlimited rolling essentially negates any actual delivery requirement of the contracts. The court is unpersuaded by these arguments.

 First, in asserting that rolls beyond the crop year are outside the scope of cash forward contracts, Oeltjenbrun relies primarily on the CFTC's May 15, 1996, *Statement of Policy*, which he argues should be accorded great deference as an agency interpretation of the statute charged with its administration. Judge Magnuson dismissed such an argument in *In re Grain Land Co-op Cases*, because "[a]gency statements of guidance are not law," and because of the "reserved terms" in which the policy interpretation was offered. *In re Grain Land Co-op. Cases*, 978 F.Supp. 1267, 1277 (D.Minn.1997). Similarly, this court finds that the CFTC's May 15, 1996, *Statement of Policy* is not the kind of agency interpretation to which any particular deference is due. As this court has observed, the degree of deference to be given an agency's interpretation depends upon what kind of rule or regulation states the interpretation. *See Sicard v. City of Sioux City*, 950 F.Supp. 1420, 1433 (N.D.Iowa 1996); *Raymond S. v. Ramirez*, 918 F.Supp. 1280, 1291–92 (N.D.Iowa 1996). "Interpretive rules" by an agency that interpret statutory language are afforded less deference than other agency pronouncements, because "interpretive rules" have not been subjected to "notice-and-comment," but instead have been " ' "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." ' " *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), in turn quoting the Attorney General's Manual on the Administrative Procedure Act 30 n. 3 (1947)). Such "interpretive rules" do not have the force and effect of law and "are not accorded that weight in adjudi-

catory process." *Id.* Although the courts may find such interpretations persuasive and treat them as if they were binding, the courts have the discretion to substitute their own judgment on all questions of statutory interpretation. *See Batterton v. Francis*, 432 U.S. 416, 424–25 & n. 9, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977). The court has some doubt the *Statement of Policy* even rises to the level of an "interpretive rule," since, as Judge Magnuson observed, it purports to explain only the Division of Economic Analysis's "views on the application of the principles of prudent risk-reduction to the structure of HTA contracts," CFTC's Division of Economic Analysis Issues Statements of Policy and Guidance Relating to "Hedge–to–Arrive" Contracts, No. 3911–96 (May 15, 1996), not a definitive statutory interpretation, and there is no indication that the *Statement of Policy* has been subjected to notice-and-comment procedures. Furthermore, nowhere in the statutory language of the CEA is there a restriction on "any sale of any cash commodity for deferred shipment or delivery," excluded from coverage by the Act, to deferment of delivery within a single crop year. 7 U.S.C. § 1a(11).

 Nor does the fact that rolling of these contracts might require other futures transactions without parallel physical transactions somehow transform these contracts for physical delivery of corn into speculative futures transactions. Such companion futures transactions are one step further removed from the "bookout" transactions described by the Ninth Circuit Court of Appeals in *In re Bybee*, because they do not extinguish the delivery obligation *on the HTA contract*, and do not involve the same parties, although, like "bookout" transactions, parallel futures transactions are separate new agreements, there is no obligation or arrangement to enter into such futures transactions in the FCS HTAs, the futures transactions are not provided for by the terms of the FCS HTAs as initially entered into, and the obligation to deliver on the FCS HTAs remains in force, however many parallel futures transactions may be entered into. *Cf. In re Bybee*, 945 F.2d at 314 (citing

*Statutory Interpretation Concerning Forward Transactions,* 55 Fed.Reg. 39188, 39192 (Sept. 25, 1990)). Although the rolling feature of these contracts undoubtedly does increase the riskiness of the trade, and does allow the producer to speculate on the delivery price of his grain, the roll feature does not negate the nature of these contracts as contracts for actual physical delivery of grain. *Accord In re Grain Land Coop Cases,* 978 F.Supp. at 1277 ("While the HTAs' rolling feature may have introduced imprudent risk in hindsight, it does not fatally detract from the instruments' principal purpose. As discussed above, the contracts on their face contemplate the cash sale of grain for deferred delivery.").

However, Oeltjenbrun asserts that the "unlimited" rolling permitted under the FCS HTAs does essentially negate any actual delivery requirement of those contracts—that is, it makes the delivery obligation "diffuse" and "indeterminate." This argument, however, disregards the fact that there are indeed limits on rolling in the contracts, because there is a price to be paid for every roll. Not only is there a spread/rolling fee, *see, e.g.,* FCS Ex. A, ¶ 8, but the CBT price, and hence the cash price, changes that occur with every roll will eventually make it more cost effective to deliver on the contracts than to roll them. The fact that, as unprecedented market conditions developed, Oeltjenbrun undertook far more rolls than could reasonably have been anticipated to take advantage of higher cash prices for grain than he could get on his HTAs does not mean that delivery would *never* occur on these contracts. Nor does the fact that rolling creates disparity between the delivery price and the value of the crop necessarily transform the HTAs into illegal futures contracts. That argument disregards the fact that the rolled price adjusts for the cost of the roll. Consequently, the rolled price may not reflect the value of the grain at delivery, but it does reflect the value of the grain reduced by the cost of rolling to a later delivery date, a benefit the producer has already enjoyed. Therefore, the FCS contracts denominated "HEDGE–TO–ARRIVE" contracts still fit within the cash forward contract exception to the CEA, because

they remain contracts for deferred shipment or delivery of actual grain.

A more comfortable fit still is that of the FCS contract denominated a "GRAIN CONTRACT," contract no. 698, FCS Ex. D. This contract is similar to the Burchinal contract held by Land O' Lakes, although it has somewhat different and additional terms. This FCS contract specifically "confirm[s] purchase" from Oeltjebrun by FCS of 5,000 bushels of grade number 2 corn at $2.85 per bushel to be delivered in April of 1996 at the FCS elevator in Klemme, Iowa. The contract contains a plethora of terms only relevant to actual delivery of grain, such as contingencies for overruns or shortages, the elevator being full on the selected delivery date, the corn not meeting grade standards, freedom of the grain from liens and encumbrances, and reservation of remedies if delivery of commodities is accepted after breach of other conditions and terms of the contract. *Id.* The contract has no provision regarding "rolling," and the record contains no evidence that it ever was rolled.

Therefore, as a matter of law, FCS's contracts with Oeltjenbrun at issue here are cash forward contracts—*i.e.,* contracts for "sale of any cash commodity for deferred shipment or delivery," 7 U.S.C. § 1a(11)—that fall outside the purview of the CEA. *Noble Metals Int'l, Inc.,* 67 F.3d at 772 ("contracts of sale of a commodity for future delivery," *i.e.,* futures contracts, must be offered or sold on commission-designated boards of trade, or they are illegal, "off-exchange" contracts); *Salomon Forex, Inc.,* 8 F.3d at 970 ("[The CEA] provides at its core that no person shall enter into, or offer to enter into, a transaction involving the sale of a "commodity for future delivery," unless it is conducted on or through a board of trade designated and regulated by the [CFTC] as an exchange ('contract market')," citing 7 U.S.C. §§ 2 & 6); *In re Bybee,* 945 F.2d 309, 312 (9th Cir.1991) (citing 7 U.S.C. § 6(a)). As a consequence of this conclusion on the issue directly presented in Oeltjenbrun's Count I for declaratory judgment, FCS is entitled to summary judgment in its favor not only on Count I, but also on Counts II and III, which are claims for fraud also brought under the

CEA, and on Oeltjenbrun's affirmative defense asserting the illegality under the CEA of the FCS HTAs in question.

### c. The FCC contracts

 FCC's contracts with Oeltjenbrun, each denominated a "HEDGE TO ARRIVE CONTRACT," are considerably different from those of Land O' Lakes or FCS. In each contract, Brad Oeltjenbrun is identified as the "Seller," and Farmers Cooperative Company of Thornton is identified as the "Buyer." Each contract is in the form of FCC contract no. 157, FCC Ex. A, with handwritten entries shown as underlined and paragraph numbers added by the court:

[1.] BUYER and SELLER agree to the following:

[2.] BUYER confirms the following futures transaction was made for seller today on the Chicago Board of Trade, Seller agrees that said grain is yet to have the "CASH PRICE" determined for arrival; [In tabular form:] QUANTITY 20000.00 BUSHELS 20000.00 GRADE & GRAIN 2y Corn ARRIVAL PERIOD June DESTINATION Thornton QUALITY 2y FUTURES OPTION CN96 FUTURES OPTION PRICE 2.85½

[3.] SELLER states knowledge of cash basis which is the difference between a designated futures option on the Chicago Board of Trade and the cash price of grain for the designated arrival period of this contract. SELLER understands that the Cash Basis has not been determined in establishing the "Cash Price" of said grain on arrival.

[4.] SELLER understands that the "Cash Basis" will be the difference between the price quoted for the futures options designated in this contract and the "Cash Price" of the grain for the designated arrival period in this contract on the date and time SELLER elects to set the cash price of said grain.

[5.] SELLER agrees to set the "Cash Basis" and determine the cash value of said grain on or before 6–30–96. Unless other terms have been agreed upon by both Buyer and Seller prior to said date, and grain has not been priced by Seller, Buyer is authorized to set the cash basis and to set the cash price of contract.

[6.] Buyer shall be responsible for commissions and margin requirements of this transaction. Buyer agrees that this transaction shall be subject to the rules of the Chicago Board of Trade and the marketing policies of the Buyer.

[7.] SELLER agrees to a service fee of 2¢ cents per bushel and the service charge will be assessed against the cash price of this contract.

[8.] Failure by the Seller to perform on this contract [sic], Seller shall be subject to all of the terms of the "Grain Purchase Contract and Confirmation" attached to and made a part of this contract.

[9.] This is NOT considered a credit sale contract as long as final price is determined before delivery.

FCC Ex. A. Although each of the contracts refers to a "Grain Purchase Contract and Confirmation" purportedly attached to the HTA, neither FCC nor Oeltjenbrun has provided the court with a copy of such a document for any of the FCC HTAs.

Although none of the HTAs provides for "rolling," each was in fact rolled. However, the roll was accomplished by canceling the original HTA and replacing it with another in similar, but not identical form. In the replacement contracts, the tabular information is presented in slightly different form, but the most salient difference is in ¶ 5, which in subsequent contracts is in the following form:

SELLER agrees to set the "Cash Basis" and determine the cash value of said grain on or before 11–30–96 and deliver no later than 11–30–96. Unless other terms have been agreed upon by both Buyer and Seller prior to said date, and grain has not been priced by Seller, Buyer is authorized to set the cash basis and to set the cash price of contract.

FCC contract no. 303, FCC Ex. G ("rolled" successor to contract no. 157, FCC Ex. A; emphasis added).

This change is significant, because in the original FCC HTAs, any obligation to make actual physical delivery—the focus of judicial

determinations of whether or not a contract is a valid cash forward contract, *see Noble Metals Int'l, Inc.*, 67 F.3d at 773; *Salomon Forex, Inc.*, 8 F.3d at 971; *In re Bybee*, 945 F.2d at 313; *Co Petro Mktg. Group, Inc.*, 680 F.2d at 578—was at best implied. The plain language of the contract only "confirms" that the "Buyer," FCC, has made a futures transaction on behalf of Oeltjenbrun, *see, e.g.*, FCC Ex. A at ¶ 2, but it does not clearly impose a duty on Oeltjenbrun to deliver any grain. At best, an inference of delivery arises from the statement that the transaction concerns a specified quantity of grain of a specified condition with a specified "Arrival Period," "Destination," and "Futures Option Price." FCC Ex. A at ¶ 2 (table). Indeed, the only place that delivery is mentioned at all in the original FCC HTAs is in the final paragraph, which states, "This is NOT considered a credit sale contract as long as final price is determined before delivery." *See, e.g.*, FCC Ex. A at ¶ 9. That paragraph also provides one of the few inklings that an actual sale of grain—not simply an agreement that one party will make a futures transaction for the other on the CBOT— might be the underlying purpose of the contract. Another hint is the reference in the penultimate paragraph that upon failure to perform the HTA, the "Seller shall be subject to all of the terms of the 'Grain Purchase Contract and Confirmation' attached to and made a part of this contract." *Id.* at ¶ 8.

Again, neither party has provided the court with the "Grain Purchase Contract and Confirmation" that forms a part of any of the FCC HTAs. However, FCC explains, by way of an affidavit from the manager of FCC, that no "Grain Purchase Contract and Confirmation" was attached to HTAs until the sale price was established and since Oeltjenbrun never established the "basis" or the sale price for any of the corn on any of the HTAs in question, no such document exists. FCC Ex. M (Supplemental Affidavit of Charles Schafer), pp. 1–2.

Although contracts made after each roll, with the exception of contract no. 281, FCC Ex. J, all add to ¶ 5 the language requiring that Oeltjenbrun "deliver no later than" a specified date, *see* FCC Exs. G, H, I, and K,

Oeltjenbrun did not sign any of the these contracts except contract no. 281. Thus, the court is loath to assume the addition of the "deliver no later than" language is indicative of Oeltjenbrun's intent, even if it clarifies FCC's intent, where FCC is the only party to have signed the contract. However, it is clear that Oeltjenbrun understood similar contracts to require actual physical delivery of corn, because he performed contract no. 158, FCC Ex. D, on a roll to contract no. 1810, FCC Ex. F, by actually delivering 30,-000 bushels of corn. *See* FCC Ex. E (Affidavit of Charles Schafer, manager of FCC); FCC Ex. M (Supplemental Affidavit of Charles Schafer), p. 1. Furthermore, the contract is between a seller engaged in the business of producing grain and a buyer engaged in the business of buying grain and involves individually negotiated terms of amount, price, and delivery date. *Salomon Forex, Inc.*, 8 F.3d at 971 ("cash forwards are generally individually negotiated sales of commodities between principals"). Also, because the contract is between a grain producer and a grain elevator, the contract was entered into between parties able to make and receive physical delivery of the subject goods. *Id.* The grain contract has "inherent value" to each of the parties: to Oeltjenbrun because it provides for sale of a portion of his annual crop, and to the elevator because it provides the source of a supply of grain for the elevator's business. *Co Petro Mktg. Group, Inc.*, 680 F.2d at 578 (examining the "inherent value" of the contract to the parties). Yet more importantly, nowhere in this record does Oeltjenbrun maintain that he did not intend to deliver on the FCC HTAs; thus, he cannot generate a genuine issue of material fact that he had no such intent or that actual delivery was not the purpose of the contract, however inartfully the contract was drafted. FED. R. CIV. P. 56(e) (the nonmovant is required to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1336,

140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach*, 49 F.3d at 1325.

Therefore, the court returns to Oeltjenbrun's argument that "it's the roll" that makes these contracts illegal futures contracts. As with the Burchinal contract and the fourth FCS grain contract, not one of Oeltjenbrun's contracts with FCC includes a provision permitting, forbidding, or in any way contemplating rolling in its original terms. Thus, the FCC contracts at best were "administered" in such a fashion that rolling was permitted. As the court explained with regard to the Burchinal contract, the rolling of the FCC HTAs is similar to the "bookout" agreements the Ninth Circuit Court of Appeals found the CFTC countenanced in *In re Bybee*, 945 F.2d at 314. Like "bookout" agreements, the agreements to roll the FCC contract were either separate, individually negotiated, new agreements, or were unilateral actions taken by FCC to afford Oeltjenbrun a further opportunity to deliver grain he had failed to deliver under the terms of the original contract or after the first roll he had requested; there was no obligation or arrangement to enter into rolls in the original contracts; the agreements to roll were not provided for by the terms of the contracts as initially entered into; and FCC was entitled to demand delivery, although it instead decided to roll the contracts, and Oeltjenbrun was entitled to make delivery, pursuant to the terms of the original contract. *In re Bybee*, 945 F.2d at 314 (citing *Statutory Interpretation Concerning Forward Transactions*, 55 Fed.Reg. 39188, 39192 (Sept. 25, 1990), which concluded that, for these reasons, "bookout" agreements did not negate the delivery requirement and did not change

cash forward contracts into illegal futures contracts). Furthermore, the obligation to make actual delivery of corn in December of 1996, after the rolls, remained just as real and binding as the delivery obligation was in the original contract, because rolling was a matter of forbearance by FCC on a demand for timely delivery, not a matter of right by Oeltjenbrun.

Thus, although the FCC contracts are less clear on the issue than were the Burchinal and FCS contracts, the court holds that, as a matter of law, FCC's contracts with Oeltjenbrun at issue here are cash forward contracts—*i.e.*, contracts for "sale of any cash commodity for deferred shipment or delivery," 7 U.S.C. § 1a(11)—that fall outside the purview of the CEA. *Noble Metals Int'l, Inc.*, 67 F.3d at 772 ("contracts of sale of a commodity for future delivery," *i.e.*, futures contracts, must be offered or sold on commission-designated boards of trade, or they are illegal, "off-exchange" contracts); *Salomon Forex, Inc.*, 8 F.3d at 970 ("[The CEA] provides at its core that no person shall enter into, or offer to enter into, a transaction involving the sale of a "commodity for future delivery," unless it is conducted on or through a board of trade designated and regulated by the [CFTC] as an exchange ('contract market')," citing 7 U.S.C. §§ 2 & 6); *In re Bybee*, 945 F.2d 309, 312 (9th Cir.1991) (citing 7 U.S.C. § 6(a)). As a consequence of this conclusion on the issue directly presented in Oeltjenbrun's Count I for declaratory judgment, FCC is entitled to summary judgment in its favor not only on Count I, but also on Counts II and III, which are claims for fraud also brought under the CEA, and Oeltjenbrun's affirmative defense asserting the illegality under the CEA of the FCC HTAs in question.[8]

---

**8.** Although the court has granted summary judgment in favor of defendant Land O' Lakes, FCS, and FCC on the only federal claims against them, the court nonetheless retains jurisdiction over the federal claims against defendant CSA and supplemental jurisdiction over Oeltjenbrun's state-law claims against all defendants pursuant to 28 U.S.C. § 1367. Furthermore, even if the court had dismissed all of the federal claims in the action, it could still retain supplemental jurisdiction, in its discretion, over the state-law claims in light of the advanced procedural posture of the case and the court's investment of

time in the proceedings. *See* 28 U.S.C. § 1367(c)(3); *see also Pioneer Hi–Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1242 (8th Cir.1994) (the decision whether to exercise supplemental jurisdiction over state-law claims when federal claims have been dismissed depends upon "Factors such as convenience, fairness, and comity," citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and stating, "It is the law of this circuit that 'the substantial investment of judicial time and resources in the case … justi-

### C. Remaining Claims Against Land O' Lakes

In addition to summary judgment on Oeltjenbrun's CEA claims, Land O' Lakes seeks summary judgment on Oeltjenbrun's common-law claims in Counts V, VI, VII, and VIII of his amended complaint, which assert common-law fraudulent misrepresentation,[9] negligent misrepresentation, breach of contract, and breach of fiduciary duty, respectively. Land O' Lakes asserts that it cannot be liable on these claims, because Oeltjenbrun does not dispute that the misconduct underlying these claims—misrepresentations in the inducement to contract and in performance of the contract—was not by any representative of Land O' Lakes, but by representatives of CSA and Burchinal months or even years before Land O' Lakes acquired the Burchinal contract. Nor, Land O' Lakes asserts, is there any basis for holding it liable for the misconduct of those other parties. Furthermore, Land O' Lakes asserts that it has never demanded that Oeltjenbrun pay any margin calls or commissions, the allegation upon which his breach-of-contract claim is founded.

Oeltjenbrun counters that Land O' Lakes assumed liability for Burchinal's acts and those of Burchinal's agent, CSA, because Land O' Lakes is a "mere continuation" of Burchinal. He adds that, even if Land O' Lakes is not a "mere continuation" of Burchinal, he can still assert these claims as defenses to the Burchinal contract. Land O' Lakes, however, does not contend that Oeltjenbrun cannot raise the same defenses against it that he could have raised against Burchinal, only that Oeltjenbrun cannot assert claims for damages based on the alleged wrongdoing that induced him into the Burchinal contract.

#### 1. "Mere continuation"

 The Iowa Supreme Court recently explained,

As a general rule, a corporation that purchases the assets of another corporation assumes no liability for the transferring corporation's debts and liabilities. *De-Lapp v. Xtraman, Inc.*, 417 N.W.2d 219, 220 (Iowa 1987). Exceptions arise only in four circumstances: (1) the buyer agrees to be held liable; (2) the two corporations consolidate or merge; (3) the buyer is a "mere continuation" of the seller; or (4) the transaction amounts to fraud. *Id* ....

The mere continuation exception, as traditionally applied, focuses on continuation of the *corporate entity*. *Grand Lab., Inc. v. Midcon Labs of Iowa*, 32 F.3d 1277, 1283 (8th Cir.1994) (applying Iowa law). The exception has no application without proof of continuity of management and ownership between the predecessor and successor corporations. Thus, " '[t]he key element of a "continuation" is a common identity of the officers, directors and stockholders in the selling and purchasing corporations.' " *Id.* (quoting *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 440 (7th Cir. 1977)); *see Weaver v. Nash Int'l, Inc.*, 730 F.2d 547, 548 (8th Cir.1984); *Tucker v. Paxson Mach. Co.*, 645 F.2d 620, 625–26 (8th Cir.1981).

*Pancratz v. Monsanto Co.*, 547 N.W.2d 198, 200–01 (Iowa 1996). Although the Iowa Supreme Court noted that there were more expansive formulations of the rule, which examine the "totality of the circumstances," it reaffirmed Iowa's adherence to the "traditional" formulation of the rule. *Id.* at 201. Therefore,

[i]n determining whether a successor corporation is liable under the mere continuation exception, this court has consistently looked for a continuity of management and

---

fies the exercise of jurisdiction over the state claim, even after the federal claim has been dismissed.' "); *Murray v. Wal–Mart, Inc.*, 874 F.2d 555 (8th Cir.1989) (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), and *North Dakota v. Merchants Nat'l Bank & Trust Co.*, 634 F.2d 368, 371 (8th Cir.1980) (*en banc* )).

9. Count V seeks damages for fraudulent misrepresentation, as does Count IV, but Land O' Lakes has not sought summary judgment on Count IV. The only difference between the two claims is the relief sought, damages on Count V, and rescission on Count IV. The court assumes that the failure of Land O' Lakes to include Count IV in its motion for summary judgment was an oversight.

ownership. *See Nelson v. Pampered Beef–Midwest, Inc.,* 298 N.W.2d 281, 288 (Iowa 1980) (holding mere continuation exception did not apply where "marked difference existed between the transferor and transferees"); *Arthur Elev. Co. v. Grove,* 236 N.W.2d 383, 392–93 (Iowa 1975) (mere continuation applied where partners who incorporated partnership remained in control). We have never applied the mere continuation exception where the buying and selling corporations had different owners. *See Grand Lab.,* 32 F.3d at 1284 n. 9. *Pancratz,* 547 N.W.2d at 201. The court did, however, clarify the relationship between the "fraud" and "mere continuation" exceptions to the non-liability rule:

> [I]n retrospect the holding [in *C. Mac Chambers Co. v. Iowa Tae Kwon Do Academy, Inc.,* 412 N.W.2d 593 (Iowa 1987), that a corporation owned by a son was a mere continuation of a corporation owned by his father] perhaps better exemplifies the fraud exception, not the mere continuation exception, to the general rule of nonliability. As recently observed by the Eighth Circuit Court of Appeals, the case "stands for the unremarkable proposition that parties cannot circumvent the mere continuation exception by inserting relatives as sham owners and directors of a new company that is in substance the predecessor." *Grand Lab.,* 32 F.3d at 1284.

*Pancratz,* 547 N.W.2d at 202.

The Iowa Supreme Court's disposition of the case before it is also instructive on precisely what evidence suffices to establish a genuine dispute on "mere continuation":

> Applying Iowa's longstanding rule to the record before us, we find beyond dispute that Knutson is not a mere continuation of Knut Co. Monsanto tendered no evidence of continuity of ownership. The two corporations shared no common stockholders. While it is true that Knutson's president and CEO, John Curry, had at one time served in a similar capacity with KCI, Curry resigned his management position with KCI two years before the sale. Thus the record contains no proof of identity of management. Other common factors urged by Monsanto (same employees,

same location, same trade name) are irrelevant when evaluating the mere continuation exception under the traditional standard.

> Furthermore, the evidence establishes that Knut Co. survived, at least for some time, after the sale. While it is true that Knutson continued Knut Co.'s general corporate activities, it carried out such operations as a distinct and separate corporate entity. *See Weaver,* 730 F.2d at 548. Unlike *C. Mac Chambers,* the record reveals no hint of a sham transfer. The substantial purchase price evidences an arm's-length transaction.

> We are convinced the district court did not err in its refusal to submit the question of whether Knutson was a "mere continuation" of Knut Co. to the jury. The commonly accepted indicia point unmistakably to nonliability. Knutson was entitled to judgment as a matter of law. Accordingly, we affirm the judgment of the district court.

*Pancratz,* 547 N.W.2d at 202.

Here, Oeltjenbrun has failed to generate a genuine issue of material fact that Land O' Lakes is a "mere continuation" of Burchinal Cooperative Society. He points to evidence that Land O' Lakes hired some of Burchinal's former employees, although it replaced the entire management of the Burchinal elevator after the transaction, the fact that Burchinal's patrons became "members" of the Land O' Lakes cooperative, and that three seats on the cooperative's Advisory Board were to be filled by Burchinal members. This evidence is plainly inadequate to meet the traditional formulation of the "mere continuation" rule applicable in Iowa. *See Pancratz,* 547 N.W.2d at 200–02.

The two corporations shared no common stockholders. *See id.* (looking for common stockholders). Even assuming that the few dozen members of Burchinal that became members of Land O' Lakes had become "voting" members, and Land O' Lakes' evidence is that none of them did, such paltry numbers in proportion to the nearly 20,000 members of Land O' Lakes clearly evidence no common management or control of the two corporations. *See id.* (looking for common

management or control). Furthermore, Oeltjenbrun does not dispute that Land O' Lakes replaced *all* of Burchinal's management with its own employees. *See id.* (finding no common management, even where the manager of the buying corporation had once been a manager of the selling corporation).

Furthermore, Land O' Lakes points out that it did not buy all of Burchinal's assets and that Burchinal survived, indeed survives, after the sale, which Oeltjenbrun does not dispute. *See id.* (finding it significant that the selling corporation survived at least for some time after the sell). Although Land O' Lakes carried on essentially all of Burchinal's corporate activities, "it carried out such operations as a distinct and separate corporate entity." *See id.* (citing *Weaver,* 730 F.2d at 548). Nor is there any hint here of a sham transfer between Burchinal and Land O' Lakes. *Id.* Rather, as in *Pancratz,* evidence of a substantial purchase price paid by Land O' Lakes for Burchinal assets indicates an arm's-length transaction. *Id.* Thus, the court holds that Land O' Lakes cannot be held liable on Oeltjenbrun's claims for fraudulent or negligent misrepresentation or breach of fiduciary duty on a "mere continuation" or "fraud" exception to the general rule of non-liability of a purchasing corporation under Iowa law.

### 2. *Defenses against a successor*

■ Oeltjenbrun is correct that an assignee or purchaser of a contract is subject to the same defenses an obligor on the contract could have raised against the original party. *See Red Giant Oil Co. v. Lawlor,* 528 N.W.2d 524, 533 (Iowa 1995); *Smith v. Brown,* 513 N.W.2d 732, 733–34 (Iowa 1994). Furthermore, this court has explained that, under Iowa law, fraudulent misrepresentation in the inducement to a contract gives rise to three distinct actions: (1) a cause of action at law for money damages, such as Oeltjenbrun asserts in Count V of his amended complaint; (2) a defense to a breach-of-contract claim, as Oeltjenbrun has pleaded in answer to Land O' Lakes' counterclaim; and (3) a ground for rescission of a contract in an action in equity, such as Oeltjenbrun asserts in Count IV of his amended complaint. *Uti-*

*ca Mut. Ins. Co. v. Stockdale Agency,* 892 F.Supp. 1179, 1191 (N.D.Iowa 1995). Although Oeltjenbrun has pleaded no basis for either the first or third kind of actions against Land O' Lakes where it is undisputed that the alleged misrepresentations were made months or years before Land O' Lakes had any interest in Burchinal or purchased the contract in question by persons not then associated in any way with Land O' Lakes, Oeltjenbrun can maintain his defenses to Land O' Lakes' breach-of-contract claim based on fraudulent misrepresentation and breach of fiduciary duty. Again, Land O' Lakes does not argue to the contrary, recognizing that Oeltjenbrun may be able to assert defenses based on alleged misrepresentations where he cannot assert claims for damages.

Thus, Land O' Lakes is also entitled to summary judgment on Oeltjenbrun's *causes of action* in Counts V, VI, and VIII of his amended complaint, which assert common-law fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty, respectively. Additionally, because the reasons for summary judgment on Count V apply with equal force to Count IV, which Land O' Lakes did not specifically include in its motion for summary judgment, the court will *sua sponte* grant summary judgment in Land O' Lakes' favor on that count as well.

### 3. *Breach of contract*

Finally, Land O' Lakes has moved for summary judgment on Oeltjenbrun's claim for breach of contract. In Count VII of his amended complaint, Oeltjenbrun alleges that "the Elevators" breached their contracts with him by breaching a covenant that they would be responsible for commissions and margin requirements of the transactions by charging him for margin calls and commissions associated with maintenance of the contracts. However, Land O' Lakes asserts that it has never demanded that Oeltjenbrun pay any margin calls or commissions. Oeltjenbrun has not responded to this argument and has therefore failed to generate a genuine issue of material fact precluding summary judgment on this claim. FED. R. CIV. P. 56(e) (the nonmovant is required to go beyond the pleadings, and by affidavits, or by the "depo-

sitions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325. Therefore, Land O' Lakes is entitled to summary judgment on Count VII of Oeltjenbrun's amended complaint, as well.

### D. Remaining Claims Against FCC

Like Land O' Lakes, FCC seeks summary judgment in its favor on Oeltjenbrun's claims in Counts V, VI, VII, and VIII of his complaint. However, FCC's grounds for summary judgment on these claims are slightly different. FCC contends that it cannot be held liable for any misrepresentations or breach of fiduciary duty by representatives of CSA, because Oeltjenbrun has not come forward with any "specific facts" showing that CSA was acting as FCC's agent in any dealings with Oeltjenbrun, or that FCC had any fiduciary duty to Oeltjenbrun when they had no previous long-term relationship, or that FCC has breached its contract with Oeltjenbrun. Oeltjenbrun resists summary judgment on these claims on the ground that there are genuine issues of material fact as to whether FCC cloaked CSA's representative with apparent authority to act as FCC's agent by encouraging Oeltjenbrun to work with that representative even after Oeltjenbrun expressed dissatisfaction with him.

#### 1. Misrepresentations and apparent authority of the speaker

■ Oeltjenbrun does not dispute that misrepresentations about the HTAs were made by a representative of CSA, not by a representative of FCC. However, he contends that FCC is nonetheless liable for those representations, because CSA had the apparent authority to act for FCC in making the alleged fraudulent and negligent misrepresentations. The Iowa Supreme Court recently explained the nature and manner of proof of apparent authority:

> Apparent authority is authority which, although not actually granted, has been knowingly permitted by the principal or which the principal holds the agent out as possessing. [*F S Credit Corp. v. Troy*

*Elevator, Inc.,* 397 N.W.2d 735, 740 (Iowa 1986)] (relying on *[Mayrath Co. v.] Helgeson,* 258 Iowa [543,] 548, 139 N.W.2d [303,] 306 [ (1966) ] ). Apparent authority must be determined by what the principal does, rather than by any acts of the agent. *Waukon Auto Supply v. Farmers & Merchants Sav. Bank,* 440 N.W.2d 844, 847 (Iowa 1989).

*Magnusson Agency v. Public Entity Nat'l Company–Midwest,* 560 N.W.2d 20, 25–26 (Iowa 1997); *see also Giese Constr. Co., Inc. v. Randa,* 524 N.W.2d 427, 431 (Iowa Ct.App. 1994) ("For apparent authority to exist the principal must have acted in such a manner as to lead persons dealing with the agent to believe the agent has authority. [*Clemens Graf Droste Zu Vischering v. Kading,* 368 N.W.2d 702, 710 (Iowa 1985)]. Apparent authority, as between the principal and third persons, must be determined by what the principal said and did rather than by the acts or statements of the purported agent. *See id.*").

Oeltjenbrun points to evidence that, in May of 1996, Charles Schafer, the manager of FCC, urged Oeltjenbrun to confer with CSA concerning HTA contracts and encouraged Oeltjenbrun to continue to work with and through CSA and to listen to CSA's recommendations, even after Oeltjenbrun expressed his dissatisfaction with CSA. He also points to evidence that in May of 1996, Schafer contacted CSA's representative to urge him to contact Oeltjenbrun to help him come up with a plan for his grain. Although this evidence might suffice to generate an issue of fact as to CSA's apparent authority to act for CSA *in May of 1996,* it fails to generate a genuine issue of material fact that CSA had the necessary apparent authority *in 1995* when CSA purportedly misrepresented aspects of HTAs to Oeltjenbrun and Oeltjenbrun in fact entered into such contracts with FCC. Only issues of fact that might affect the outcome of the suit under the governing law are material, and thus are sufficient to preclude summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (a factual dispute is "material," and will therefore preclude summary judgment, only if it "might affect the outcome of the suit under the

governing law"); *Beyerbach,* 49 F.3d at 1326 (same); *Hartnagel,* 953 F.2d at 394 (same). The issue of fact asserted by Oeltjenbrun does not meet this requirement. Hence, there is no genuine ssue of material fact precluding summary judgment on Oeltjenbrun's fraudulent and negligent misrepresentation claims. FCC is entitled to summary judgment in its favor on Counts V and VI of Oeltjenbrun's amended complaint. Furthermore, as it did with respect to Land O' Lakes, the court will *sua sponte* grant summary judgment in FCC's favor on that count as well, because the reasons for summary judgment on Count V apply with equal force to Count IV, which FCC did not specifically include in its motion for summary judgment.

### 2. *Breach of contract*

■ Furthermore, Oeltjenbrun has failed to demonstrate how, even if there is a genuine issue of material fact as to CSA's apparent authority to act as FCC's agent, this also means there is a genuine issue of material fact precluding summary judgment on either his breach-of-contract or breach-of-fiduciary-duty claims. The essence of the breach-of-contract claim is that there was a covenant in Oeltjenbrun's contracts with FCC that FCC would be responsible for margin calls and commissions of the transaction and that FCC breached that covenant by charging Oeltjenbrun for commissions and margin calls. *See* Amended Complaint, Count VII.

The court notes, first, that there is indeed a provision in the FCC HTAs which expressly provides that "Buyer shall be responsible for commissions and margin requirements of this transaction." *See, e.g.,* FCC Ex. A, ¶ 6. However, even if FCC repriced an HTA when it was rolled, to reflect the difference in price between the original delivery month and the new delivery month, that is not the same as charging Oeltjenbrun for commissions or charging him for margin requirements, which reflect a difference in price between the hedge price and the market price on the underlying hedge transaction during the time *prior to* the original delivery date, *i.e.,* during the life of the original, underlying hedge transaction that was liquidated by FCC when the HTA was rolled.

Oeltjenbrun has pointed to no evidence that FCC ever demanded separate payment of margin calls or commissions. Oeltjenbrun has thus failed to generate a genuine issue of material fact precluding summary judgment on his breach-of-contract claim against FCC, because the issue of fact he asserts concerning apparent authority of CSA is not material to a claim of breach of contract by charging for margin requirements, *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (a factual dispute is "material," and will therefore preclude summary judgment, only if it "might affect the outcome of the suit under the governing law"); *Beyerbach,* 49 F.3d at 1326 (same); *Hartnagel,* 953 F.2d at 394 (same), and he has failed to generate genuine issues of material fact that his contracts with FCC were ever breached in the manner pleaded. FED. R. CIV. P. 56(e) (the nonmovant is required to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325. FCC is therefore entitled to summary judgment on Count VII of Oeltjenbrun's amended complaint.

### 3. *Breach of fiduciary duty*

■ The essence of Oeltjenbrun's breach-of-fiduciary-duty claim is that FCC breached its fiduciary duty to Oeltjenbrun by failing to use reasonable care in advising Oeltjenbrun about HTAs and promoting unsuitable contracts, failing to monitor and disclose the status of futures positions maintained under the HTAs, and failing to disclose the risks of HTAs. Although it is CSA that is alleged to have provided Oeltjenbrun with advice about HTAs and to have failed to disclose the risks of HTAs, a genuine issue of material fact as to the apparent authority of CSA to act for FCC does not generate a genuine issue of material fact as to whether FCC owed any fiduciary duty to Oeltjenbrun in the first place. FCC seeks summary judgment on this claim specifically on the ground that it owed Oeltjenbrun no fiduciary duty in the circumstances presented and Oeltjenbrun has not responded to that argument.

The Iowa Supreme Court has defined a fiduciary relationship in the following manner:

> "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship. *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986) (citing Restatement (Second) of Torts § 874 cmt. a (1979)). We have also noted that
>
>> a confidential relationship "exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind.... The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. [The][p]urpose of the doctrine is to defeat and protect betrayals of trust and abuses of confidence."
>
> *Hoffman v. National Med. Enters., Inc.*, 442 N.W.2d 123, 125 (Iowa 1989) (quoting *Oehler v. Hoffman*, 253 Iowa 631, 635, 113 N.W.2d 254, 256 (1962))....
>
>> ....[W]e are cognizant of the fact that "[b]ecause the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case."
>
> *Kurth*, 380 N.W.2d at 696.

*Wilson v. IBP, Inc.*, 558 N.W.2d 132, 138 (Iowa 1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997); *see also Anderson v. Boeke*, 491 N.W.2d 182, 188 (Iowa Ct.App.1992) ("'A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation,'" quoting *Kurth*, 380 N.W.2d at 695, in turn quoting Restatement (Second) of Torts § 874 cmt. a). "Some of the indicia of a fiduciary relationship include the acting of one person for another; the having and exercising of influence over one person by another; the inequality of the parties; and the dependence of one person on another." *Irons v. Community State Bank*, 461 N.W.2d 849, 852 (Iowa Ct.App.1990). Fiduciary duty arises, for example, between attorneys and clients, guardians and wards, and principals and agents. *Kurth*, 380 N.W.2d at 698; *accord Engstrand v. West Des Moines State Bank*, 516 N.W.2d 797, 799 (Iowa 1994) (citing *Kurth* ).

From FCC's undisputed evidence, the relationship between Oeltjenbrun and FCC was not of the kind to give rise to a fiduciary duty. Rather, Oeltjenbrun and FCC had no contact until shortly before Oeltjenbrun entered into HTAs with FCC in 1995. Thus, the parties here had at best an arm's-length, business relationship. Oeltjenbrun has failed to come forward with evidence to generate a genuine issue of material fact otherwise. FED. R. CIV. P. 56(e) (the nonmovant is required to go beyond the pleadings; and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka*, 122 F.3d at 562; *McLaughlin*, 50 F.3d at 511; *Beyerbach*, 49 F.3d at 1325.[10] Therefore, FCC is entitled to summary judgment on Count VIII of Oeltjenbrun's amended complaint, as well.

### III. CONCLUSION

The court concludes that, as a matter of law, none of the so-called HTA contracts presented here is an illegal, off-exchange futures contract in violation of the CEA. Rather, each is a valid cash forward contract that falls outside the purview of the CEA. As a consequence, the Elevators are entitled to summary judgment in their favor not only on Count I, Oeltjenbrun's declaratory judgment claim seeking a declaration that the contracts are in violation of the CEA and his affirmative defense to the Elevators' counterclaims on the same ground, but on Counts II and

---

10. Although it might be a closer question whether CSA had a fiduciary relationship with Oeltjenbrun, at least as far as Oeltjenbrun's pleadings go, because CSA purportedly claimed to act or advise with Oeltjenbrun's interest in mind, *Wilson*, 558 N.W.2d at 138 (citing *Hoffman*, 442 N.W.2d at 125, in turn quoting *Oehler*, 253 Iowa at 635, 113 N.W.2d at 256), the court concluded above that Oeljenbrun had failed to generate a genuine issue of material fact that CSA was acting as FCC's agent or with the apparent authority of FCC.

III, which allege fraud in violation of the CEA. Land O' Lakes is also entitled to summary judgment on Oeltjenbrun's remaining claims against it, because Oeltjenbrun has failed to generate a genuine issue of material fact that Land O' Lakes is a "mere continuation" of Burchinal Cooperative Society, and hence could be held liable for misrepresentations and breach of fiduciary duty by Burchinal or one of Burchinal's agents, or that Land O' Lakes ever demanded that Oeltjenbrun pay any margin calls or commissions purportedly in breach of the Burchinal contract. FCC is also entitled to summary judgment on the remaining claims against it, because Oeltjenbrun has failed to generate a genuine issue of material fact that CSA was acting with the apparent authority of FCC, that his contracts with FCC were ever breached in the manner pleaded, or that FCC had a fiduciary relationship with him.

Therefore, **partial summary judgment** in favor of the Elevators is **granted** as follows:

1. **Partial summary judgment** in favor of defendant Land O' Lakes is **granted** on Counts I, II, III, IV, V, VI, VII, and VIII of Oeltjenbrun's complaint and Oeltjenbrun's affirmative defense to Land O' Lakes' counterclaim in which Oeltjenbrun reasserts his contention that his HTA with Land O' Lakes is an illegal futures contract.

2. **Partial summary judgment** in favor of defendant FCC is **granted** on Counts I, II, III, IV, V, VI, VII, and VIII of Oeltjenbrun's complaint and Oeltjenbrun's affirmative defense to FCC's counterclaim in which Oeltjenbrun reasserts his contention that his HTAs with FCC are illegal futures contracts.

3. **Partial summary judgment** in favor of defendant FCS is **granted** on Counts I, II, and III of Oeltjenbrun's complaint and Oeltjenbrun's affirmative defense to FCS's counterclaim in which Oeltjenbrun reasserts his contention that his HTAs with FCS are illegal futures contracts.

**IT IS SO ORDERED.**